IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiffs,<br><br>vs.<br><br>LAFI JAFARI, and MARYLOU GRUTTEMEYER,<br><br>Defendants. | 8:16CR318<br><br>**FINDINGS AND RECOMMENDATION** |

This matter is before the Court on multiple motions filed by co-defendants Lafi Jafari ("Jafari") and Mary Lou Gruttemeyer ("Gruttemeyer" or "Ted") (collectively referred to herein as "Defendants"). Jafari has filed a Motion to Dismiss for Outrageous Government Conduct ([Filing No. 43](#)), Motion to Suppress Statements ([Filing No. 44](#)), and Motion to Dismiss Count 7 of the Indictment ([Filing No. 42](#)). Gruttemeyer has filed a Motion to Dismiss for Outrageous Government Conduct ([Filing No. 36](#)), Motion to Suppress Statements ([Filing No. 38](#)), Motion to Dismiss Count 7 ([Filing No. 40](#)), and Motion to Sever ([Filing No. 34](#)). Because most of the arguments advanced by Jafari and Gruttemeyer in support of their respective motions are identical, the motions will all be addressed in this order.

Jafari and Gruttemeyer are charged in an eight-count indictment with conspiracy to commit bribery in violation of 18 U.S.C. § 371 and 18 U.S.C. § 666, as well as six substantive counts of bribery in violation of 18 U.S.C. § 666(a)(2) and 18 U.S.C. § 2. Jafari is also charged with lying to investigators in violation of 18 U.S.C. § 1001. Essentially, the indictment alleges that Jafari, a director/owner of M M & L International, conspired with Gruttemeyer, who was employed as a secretary for M M & L International, to bribe an Omaha Housing Authority employee.

On November 7 and December 6, 2017, the Court held evidentiary hearings on Defendants' motions.[1] The transcript was filed on December 27, 2017. ([Filing No. 74](#).) Post-hearing briefs were submitted on January 31, 2018. This matter is now ripe for disposition.

### BACKGROUND

The Omaha Housing Authority ("OHA") is a local, public housing agency that provides low to moderate income housing which is funded by Housing and Urban Development ("HUD"). (TR. 8-9.) HUD provides, thorough its Section 8 program, housing assistance payments, otherwise known as HAP, so public housing agencies, such as OHA, can provide housing for tenants. (TR. 9-10.) A tenant will find a landlord who is signed up and approved by OHA to provide housing, and then the HAP payment will be made to the landlord for housing the tenant. (TR. 10.)

The Office of Inspector General ("OIG") opened an investigation into Jafari, who was the largest landlord of OHA, in February of 2012. (TR. 10.) The investigation started when an OHA employee, Reggie Johnson ("Johnson"),[2] informed Special Agent Gleich ("Agent Gleich") of the OIG that he had received an envelope from Jafari.[3] (TR. 10-11.) Johnson told Agent Gleich that he went to Jafari's office to meet Jafari for lunch on February 24, 2012. At the office, Johnson was met by Gruttemeyer, who patted him down and asked whether he was recording the conversation. (TR. 13-14.) At lunch, Jafari spoke about mayors, executive directors of OHA, and his relationship with these individuals. (TR. 15.) At one point during the lunch, Jafari closed the blinds next to their table and slid an envelope containing $500 in cash to

---

[1] The government opposed a hearing on the issue of outrageous government conduct. The government argued that a hearing on the issue was not warranted because Defendants had not presented specific facts sufficient to raise a significant doubt about the propriety of the government's actions. Based on Defendants' briefs, and the fact that the first incident alleged in the indictment occurred in 2012 and the indictment was not returned until 2016, the Court allowed a hearing on the issue.

[2] Johnson was a program integrity specialist for OHA. (TR. 11.) In that position, Johnson conducted compliance investigations concerning tenants and landlords. (TR. 11.) Johnson's investigations could make the difference as to whether a landlord or tenant would be allowed to continue to participate in the Section 8 program. (TR. 11.)

[3] Agent Gleich testified at the evidentiary hearing that Johnson was a witness in the investigation. (TR. 126.)

Johnson. (TR. 15.) The cash was broken up into $300 of $1 bills, and $200 of $2 bills.[4] (TR. 16.) Jafari did not request that Johnson take any action in exchange for the cash. (TR. 15.) However, Jafari told Johnson that he should not be seen with Jafari and that he should be careful not to be seen with him. (TR. 15.)

Based on Johnson's report, OIG decided to take a wait-and-see approach, and advised Johnson to contact Agent Gleich if Gruttemeyer or Jafari contacted him. (Tr. 17.) The OIG also started interviewing other OHA employees regarding Jafari and Gruttemeyer. (TR. 17-18.) On May 9, 2012, OIG investigators interviewed Sandra Campbell ("Campbell"), an OHA intake specialist. (TR. 18.) Campbell told investigators that Gruttemeyer offered to pay her a referral fee if she would refer prospective OHA tenants to properties owned by Jafari and/or M M & L International. (TR. 19-20.) OIG also interviewed Joan Anderson ("Anderson"), who was the Section 8 supervisor/director. (TR. 21.) Anderson reported a previous incident involving former OHA employee, Jovetta King ("King"). (TR. 21.) Anderson believed King was fired, or allowed to resign, as a result of accepting referral fees from Jafari. (TR. 21.) OIG reached out to King, who denied receiving referral fees from Jafari. (TR. 22.)

In August, 2013, Johnson reported to investigators that he had received money from Gruttemeyer and Jafari. (TR. 22-23.) Johnson reported that in July, 2013, he and his wife had a chance meeting with Defendants at a Cracker Barrel in Council Bluffs, Iowa. As Johnson and his wife were leaving the restaurant, Gruttemeyer approached them and gave Mrs. Johnson an envelope containing approximately $200 in $2 bills. Jafari and Gruttemeyer did not request anything in exchange for the cash.[5] Because Jafari and Gruttemeyer did not request anything in exchange for the money, investigators continued to take a wait-and-see approach to see if anything else would happen. (TR. 23-24.)

---

[4] Johnson testified that after lunch with Jafari, Johnson called Agent Gleich who arranged for Johnson to meet with a Secret Service Agent. (TR. 272.) According to Johnson, he gave Agent Gleich and the Secret Service Agent the sealed envelope of money. (TR. 272-273.) Agent Gleich testified that she was not with Johnson when he met with the Secret Service Agent who opened the envelope. Agent Gleich stated that the Secret Service Agent gave the envelope and money back to Johnson to keep so he could give it to Agent Gleich several days later when she met with Johnson. (TR. 126-27.)

[5] The Court notes that Johnson testified that they turned the money over to the authorities, but Agent Kanakares and Agent Gleich testified that this money was never recovered because Mrs. Johnson spent it. (TR. 91, 135, 276.)

On January 24, 2014, Gruttemeyer contacted Johnson and reported an unauthorized tenant in one of Jafari's units. (TR. 25.) She asked him to check to see whether the tenant was on the property.[6] (TR. 200.) Gruttemeyer said that she had something special for Johnson if he could take care of it for her. (TR. 25.) Johnson said he would check into the matter. Johnson reported his conversation with Gruttemeyer to investigators, and investigators decided to record future conversations between Johnson and Gruttemeyer. (TR. 26.)

Johnson had confirmed the presence of an unauthorized tenant in one of Jafari's unit and contacted Gruttemeyer to schedule a meeting with her to discuss the matter. (TR. 26, 203.) On the phone call to set up the meeting, Gruttemeyer told Johnson she had something for his wife. Gruttemeyer wanted Johnson to take his wife somewhere for Valentine's Day. (Ex. 1.)

On February 11, 2014, Johnson met with Gruttemeyer at the office of M M & L International. (TR. 29.) The meeting was recorded. Johnson reported his findings regarding the tenant and told Gruttemeyer that the tenant would be terminated from the program. (TR. 27.) Gruttemeyer then gave Johnson an envelope containing $298 in $2 bills, telling him to take his wife out. Johnson turned the envelope over to investigators. (TR. 30-31; Ex. A.)

Johnson and Gruttemeyer met at Tussey's restaurant later in the day on February 11, 2014. (TR. 31.) The meeting was recorded. At the meeting, Johnson told Gruttemeyer that someone may be watching and thinking that he was taking money or receiving money from Jafari and Gruttemeyer. (TR. 31-32.) Gruttemeyer responded she would say, "who is Reggie," and tell investigators that she had never been into the office and that she had no idea what money was being referenced. (TR. 32; Ex. A.) Johnson also asked whether Jafari and Gruttemeyer were giving money to other people. Gruttemeyer responded, "no." (Ex. A.)

On April 15, 2014, Johnson called Gruttemeyer and during the recorded call, Johnson told Gruttemeyer that the "Feds" were there and talking to everyone, he was going to have to meet with them in the afternoon, and that they may be looking at Jafari. (TR. 33, 222-223; Ex.

---

[6] If someone has an unauthorized tenant living in a property, it is a violation of the HAP contract. (TR. 25.)

4

A.) Gruttemeyer stated that she did not know Johnson, and that she had not given him anything. Johnson told Gruttemeyer that they needed to meet to discuss what was going on. (Ex. A.)

Gruttemeyer met with Johnson on April 15, 2014. The meeting was audio and video recorded. Johnson, at the request of investigators, told Gruttemeyer that a subpoena had been served on OHA and agents were asking questions. (TR. 33-34; Ex. B.) He told her the inquiry concerned someone at OHA claiming they had been offered money to steer prospective tenants to Jafari properties. (TR. 34.) Johnson relayed concern to Gruttemeyer that he might need to turn over information as part of the subpoena. (TR. 34; Ex. B.) Gruttemeyer initially told Johnson to go ahead and turn it over. (TR. 35; Ex. B.) As the conversation evolved, Johnson suggested that the information should be deleted. Gruttemeyer agreed. (TR. 35; Ex. B.) Johnson did not request that he be given something in the event he deleted the file. (TR. 35; Ex. B.) During the meeting, Gruttemeyer also told Johnson that she did not know him. She said Johnson was the only one she gave money to because she liked his wife. (Ex. B.)

On April 16, 2014, Johnson and Gruttemeyer had another meeting. The meeting was audio and video recorded. Johnson lied at the request of investigators, and told Gruttemeyer that he had deleted the file. He asked her to be paid for deleting the file. (TR. 35-36; Ex. B.) Gruttemeyer said she would check if Jafari was around and whether he would see Johnson and give him something. Gruttemeyer left the room. When she returned, she showed Johnson four $100 bills. Gruttemeyer asked Johnson if that was enough. (TR. 36; Ex. B.) Johnson indicated it was, left with the money, and turned it over to investigators. (TR. 36.)

Based on what transpired between Johnson and Gruttemeyer, investigators decided to interview Jafari and Gruttemeyer. (TR. 36-37.) On April 16, 2014, Agent Gleich and Agent Kanakares went to the office of M M & L International. (TR. 37.) Upon arrival, Agent Gleich and Agent Kanakares, dressed in plain clothes, made contact with Gruttemeyer. (TR. 38.) Agent Gleich and Agent Kanakares told Gruttemeyer who they were and asked to interview her about whether she had given anything of value or asked for anything of value from OHA employees. (TR. 38.) Their weapons were not on display or visible at the time they requested the interview. (TR. 38-39.) She allowed them to enter the office. (TR. 39.) The agents did not search the premises or conduct a walk-through to determine whether anyone else was in the house. (TR.

5

39-40.) Gruttemeyer was not patted down for weapons. (TR. 40.)

The interview with Gruttemeyer lasted approximately one hour and was non-confrontational. (TR. 40.) The agents did not confront Gruttemeyer about making numerous false statements to them. (TR. 40.) No promises, threats, or force was used to make Gruttemeyer make a statement. (TR. 42, 214.) Gruttemeyer did not appear to be under the influence of any mind-altering substance, and appeared to understand the agents' questions.[7] (TR. 42, 48, 112.) Gruttemeyer's answers were responsive to the agents' questions. (TR. 42.) Gruttemeyer was not emotional during the meeting, and denied providing or receiving anything of value from any OHA employee. (TR. 41, 44.) Gruttemeyer was not given *Miranda* warnings. (TR. 40.) Gruttemeyer's freedom was not restrained at any point. (TR. 40-41.) Gruttemeyer actually got up and left the agents' presence at one point during the interview to assist a tenant who had stopped by. (TR. 41.) At no time did Gruttemeyer state that she did not want to speak to the agents or request an attorney. (TR. 42.) At one point, Gruttemeyer took the agents on a tour of the premises. (TR. 42-43.) Gruttemeyer was not arrested at the conclusion of the interview. (TR. 44.) The agents advised Gruttemeyer that they wanted to speak to Jafari. (TR. 44.) Gruttemeyer told them that Jafari was not there, but that he would be back later. (TR. 43.) Gruttemeyer told the agents that they could stay and wait for Jafari. The agents declined her offer and left. (TR. 43-44.)

Later that day, on April 16, 2014, Gruttemeyer called the agents and advised them that Jafari was at the office and would be happy to speak to them. (TR. 44.) The agents returned to the office and met with Jafari. Upon meeting him, the agents identified themselves and showed their credentials. (TR. 45.) The agents advised Jafari that they were inquiring as to whether he had given anything of value to an OHA employee or received anything of value from an OHA employee. (TR. 47.) Jafari denied having done so, and also denied knowing Johnson. (TR. 48-49.) The agents did not confront Jafari with contradictory information. (TR. 48-49.) Jafari was not given *Miranda* warnings and did not attempt to terminate the interview at any time. (TR.

---

[7] At the evidentiary hearing, through questioning of the agents, Gruttemeyer seemed to imply that she did not understand the agents because she is not from the United States and English is not her first language. (TR. 104.) However, Gruttemeyer has been in the United States since 1985. (TR. 112.) The audio and video in this case show that Gruttemeyer understands English and can speak English very well. (Exs. 1, A, B.)

6

47.) The agents did not use force or make any threats or promises to get Jafari to answer their questions. (TR. 47.) Jafari seemed to understand what the agents were asking, and did not appear to be under the influence of alcohol or drugs during the interview.[8] (TR. 48-49.) The agents' conversation with Jafari was cordial and Jafari was not emotional during the interview. (TR. 49.)

On about February 5, 2015, Gruttemeyer called Johnson and reported that OHA was trying to recoup slightly in excess of $6,200 from Jafari or M M & L International in rent payments for a tenant who OHA was claiming was not living in one of Jafari's properties. (TR. 50-51.) The approximate $6,200 had already been withheld from payments OHA made to Jafari and/or M M & L International. (TR. 50.) Gruttemeyer explained to Johnson that she believed the tenant still resided in the property and that they had witnesses to that effect. (TR. 50.) Gruttemeyer wanted Johnson to look into the matter. (Ex. A.)

On February 6, 2015, Gruttemeyer and Johnson met at the M M & L International office. The meeting was video and audio recorded. At the meeting, Gruttemeyer insisted the tenant was present at the property throughout the time that OHA was claiming she no longer lived there. Johnson said he would look into the matter and that once his investigation was complete, he would send an email to OHA summarizing what he had determined. He told Gruttemeyer that if he verified the tenant was in the house, OHA would give the money back to Jafari and/or M M & L International. (Ex. B.)

Gruttemeyer and Johnson met on February 11, 2015, which was Johnson's last day of employment with OHA. (TR. 51.) The meeting was video and audio recorded. Johnson told Gruttemeyer that he completed his investigation and had determined that the tenant was not living in the unit. (TR. 51; Ex. B.) Johnson indicated that he was at the point in the investigation where he would send an email indicating that the tenant either lived in the unit or did not live in the unit. (TR. 51.) Gruttemeyer asked if there was anything that could be done to change it.

---

[8] At the evidentiary hearing, through questioning of the agents, and his brief filed in this case, Jafari seems to imply that he did not understand the agents because he is not from the United States and English is not his first language. (TR. 64.) However, Jafari has been in the United States since 1960. (TR. 110.) He has run a very successful business and has been in business with OHA since 1970. (TR. 110.)

7

Johnson replied that it was up to her.  (Ex. B.)  Gruttemeyer told Johnson she would like for him to report that the individual was living in the unit.  (TR. 51-52; Ex. B.)  Johnson asked for payment in return for telling OHA that the tenant was living in the unit.  (TR. 52; Ex. B.)  Gruttemeyer told Johnson that Jafari was not there, and that he had the cash so they would have to meet later in the day.  (TR. 52; Ex. B.)  Gruttemeyer said she would contact Johnson later that day.  (TR. 51-52; Ex. B.)

Gruttemeyer and Johnson met again on February 11, 2015, at the office of M M & L International.  The meeting was video and audio recorded.  Gruttemeyer greeted Johnson on the porch holding a sign which indicated that it smelled inside.  The sign asked if they could do this out there and whether $700 was enough.  Gruttemeyer then counted out $700 in cash and provided it to Johnson.  (TR. 52-53, 210; Ex. B.)

## DISCUSSION

1.  **Motions to Suppress**

Defendants contend that their Fifth Amendment rights were violated because they were not read their *Miranda* rights before being interviewed by Agent Gleich and Agent Kanakares or, alternatively, that the statements they gave to investigators were involuntary.  The evidence shows that these arguments are without merit.

The Fifth Amendment requires that *Miranda* warnings be given when a person is interrogated by law enforcement after being taken into custody.  *United States v. Huether*, 673 F.3d 789, 794 (8th Cir. 2012).  "To determine whether a defendant was in custody for *Miranda* purposes, a court looks to the totality of the circumstances confronting the defendant at the time of the interview, and asks whether a reasonable person in his position would consider his freedom of movement restricted to the degree associated with formal arrest."  *Id*. (quotation omitted).  "The inquiry is an objective one, without consideration of the participants' subjective views."  *Id*.  "The following non-exclusive factors inform the custody inquiry:  (1) whether the suspect was informed that he was free to leave and that answering was voluntary; (2) whether the suspect possessed freedom of movement; (3) whether the suspect initiated contact or voluntarily

8

acquiesced; (4) whether strong arm tactics or strategies were employed; (5) whether the atmosphere was police dominated; or (6) whether the suspect was placed under arrest at the end of questioning." *Id*.

"The test for determining the voluntariness of a confession is whether the police extracted the confession by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." *United States v. Estey*, 595 F.3d 836, 839 (8th Cir. 2010) (quotation omitted). In deciding whether a suspect's statements were made voluntarily, courts consider the totality of the circumstances. *Id*.

The evidence shows that neither Defendant was in custody at the time they were interviewed, nor did they make any involuntary statements. When Agent Gleich and Agent Kanakares arrived at the office of M M & L International, they asked Gruttemeyer if she would speak to them about whether she had given anything of value or asked for anything of value from OHA employees. At the time of the request, the agents were dressed in plain clothes and their weapons were not visible. Gruttemeyer agreed to the interview and did not attempt to terminate it at any time. The interview was non-confrontational and Gruttemeyer did not become emotional. Gruttemeyer was not restrained at any point. In fact, she was able to leave the agents during the interview to assist a tenant. The agents did not use force or make any threats or promises to get Gruttemeyer to answer questions. Gruttemeyer appeared to understand the questions and her responses to the questions were appropriate. Gruttemeyer did not appear to be under the influence of alcohol or drugs.

Gruttemeyer contacted the agents following her interview and told them that Jafari was back at the office and willing to speak to them. Upon meeting Jafari, the agents identified themselves and showed their credentials. The agents advised Jafari that they were inquiring as to whether he had given anything of value to an OHA employee or received anything of value from an OHA employee. Jafari agreed to the interview, and did not attempt to terminate it at any time. Jafari never asked for an attorney. The agents did not use force or make any threats or promises to get Jafari to answer their questions. Jafari seemed to understand what the agents were asking him, and did not appear to be under the influence of alcohol or drugs. The agents' conversation with Jafari was cordial and the agents did not present Jafari with incriminating evidence.

Jafari and Gruttemeyer agreed to be interviewed, did not seek to terminate their interviews, and possessed freedom of movement throughout their questioning. The agents did not use strong arm tactics, threats or promises to get Defendants to speak to them. The agents were in plain clothes and did not display their weapons. Defendants were not searched at the time of questioning, and the agents did not search the premises for the presence of others. All questioning was done in a cordial manner and neither Defendant was arrested following questioning. The totality of the circumstances confronting the defendants at the time of their interviews, a reasonable person in their position would not consider their freedom of movement restricted to the degree associated with formal arrest. In addition, there is no evidence that the police extracted Defendants' statements by threats, violence, or direct or implied promises, such that Defendants' will was overborne and their capacity for self-determination critically impaired. There simply is no evidence supporting the contention that Defendants were in custody or provided any involuntary statements. Therefore, the motions to suppress should be denied.

### 2. Motions to Dismiss for Outrageous Government Conduct

Defendants contend that the indictment should be dismissed because the government engaged in outrageous conduct. Defendants claim that they were improperly targeted for investigation and that Johnson harassed them to provide him money. Defendants further contend that the government was excessively involved in inducing a crime.

"The defense of outrageous government conduct is similar to, although different from, the defense of entrapment." *United States v. Hunt,* 171 F.3d 1192, 1195 (8th Cir. 1999). "Whereas the defense of entrapment focuses on the predisposition of the defendant to commit the crime, the defense of outrageous government conduct focuses on the government's actions." *Id*. "The level of outrageousness needed to prove a due process violation is quite high, and the government's conduct must shock the conscience of the court." *Id*. (quotations omitted). The Eighth Circuit has recognized that government agents "may go a long way in concert with the individual in question without being deemed to have acted so outrageously as to violate due process." *Id.* Outrageous government conduct only requires dismissal of the charge "if it falls

10

within the narrow band of the most intolerable government conduct." *United States v. Morse, 613 F.3d 787, 792-93 (8th Cir. 2010)* (quotation omitted).

Based on the evidence in this case, the undersigned concludes that there is no evidence of outrageous government conduct. The evidence shows that the investigation into Jafari and Gruttemeyer began after Johnson reported being patted down by Gruttemeyer for recording devices and receiving unsolicited money from Jafari. Following this report, investigators waited to see whether there would be an attempt by Defendants to obtain action in exchange for money. After becoming aware of the situation involving an unauthorized tenant in one of Jafari's properties, investigators became more proactive. It was at that point that investigators encouraged Johnson to ask Defendants for money. Defendants had already provided Johnson unsolicited money on three separate occasions. There is no evidence suggesting that Jafari and Gruttemeyer were pressured to pay Johnson. Agents considered Johnson a witness and Johnson had no arrest authority. Johnson did not put his hands on either Defendant or ever raise his voice at them. The conduct in this case does not "shock the conscience" of the Court. The undersigned finds that the motions to dismiss should be denied.

### 3. Motions to Dismiss Count 7 of the Indictment

Defendants argue that Count 7 of the indictment, which alleges that Defendants, as co-conspirators, provided a payment to Johnson in violation of 18 U.S.C. § 666(a)(2) and 18 U.S.C. § 2, should be dismissed. Defendants contend that dismissal is warranted because Johnson was not an agent for the OHA on February 11, 2015, the day that the money was allegedly provided to Johnson. The evidence shows that Johnson was, in fact, an agent on that date.[9] (TR. 211-212.) Therefore, the motions to dismiss Count 7 should be denied.

---

[9] According to Agent Gleich, Johnson had reported to her that his last day of work was going to be on a Wednesday. (TR. 144.) The parties stipulated at the hearing that February 10, 2015, was a Tuesday, not a Wednesday. Agent Gleich testified that Johnson's last day of work was Wednesday, February 11, 2015.

### 4. Gruttemeyer's Motion to Sever

Gruttemeyer contends that the actions should be severed because Count 8 of the indictment only charges Jafari with the crime of lying to investigators and does not allege that she was complicit in that offense. Rule 8(a) of the Federal Rules of Criminal Procedure permits the government to charge multiple counts in a single indictment if "the offenses are of the same or similar character, based on the same act or transaction, or are parts of a common scheme or plan." *United States v. Steele*, 550 F.3d 693, 702 (8th Cir. 2008). Rule 8(b) allows the government to charge two or more defendants in an indictment if the defendants "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). Rule 8 "is broadly construed in favor of joinder to promote the efficient administration of justice." *United States v. Taken Alive*, 513 F.3d 899, 902 (8th Cir. 2008). "Rarely, if ever, will it be improper for co-conspirators to be tried together." *United States v. Drew*, 894 F.2d 965, 968 (8th Cir. 1990).

Once it is determined that joinder is appropriate under Rule 8, Rule 14 of the Federal Rules of Criminal Procedure specifies that the district court may nevertheless order separate trials if a joint trial would "prejudice a defendant or the government." Fed. R. Crim. P. 14. Severance is required when the prejudice caused by a joint trial is severe or compelling. *United States v. Ruiz*, 412 F.3d 871, 886 (8th Cir. 2005).

The government was permitted, under Rule 8, to charge Defendants in a single indictment, as well as to include multiple counts in the indictment. The allegations set out in the indictment are based upon the same acts and are part of a common scheme. Moreover, Defendants, charged as co-conspirators, are alleged to have participated in the same series of acts constituting the alleged offenses. Gruttemeyer had not demonstrated that any prejudice would result from trying these actions together. While Count 8 of the indictment only charges Jafari with lying to investigators, there is nothing in the record to support that this charge against Jafari will reflect poorly upon Gruttemeyer or severely prejudice her. Therefore, the motion to sever should be denied.

Accordingly,

**IT IS HEREBY RECOMMENDED** to United States District Court Judge John Gerrard that Defendants' motions be denied.

Dated this 2nd day of March, 2018.

BY THE COURT:

s/ Susan M. Bazis
United States Magistrate Judge

## ADMONITION

A party may object to a magistrate judge's order by filing an objection within fourteen (14) days after being served with a copy of the findings and recommendation. Failure to timely object may constitute a waiver of any objection.